**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:21-CR-160** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **ESTEBAN LATORRE-CACHO,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Defendant Esteban Latorre-Cacho moves to suppress evidence obtained during the search of a vehicle he was driving.  He also moves to suppress statements he made after his arrest.  For the following reasons, we will deny Latorre-Cacho's motion.

**I.    Factual Background & Procedural History[1]**

On April 30, 2021, Pennsylvania State Police ("PSP") Trooper Brian Konopka was monitoring traffic on Interstate 78 ("I-78") in Lehigh County.  (See 7/11/22 Tr. 6:25-7:9).  Trooper Konopka was stationed in an unmarked vehicle as part of PSP's highway criminal interdiction unit, more commonly known as the Safe Highway through Effective Law Enforcement and Detection ("SHIELD").  (See id. at 4:6-12, 6:12-7:3).  In 2021, he had approximately three years of experience with the SHIELD

---

[1] The following factual narrative derives from testimonial, documentary, and video evidence adduced during the suppression hearing in this matter, together with the parties' briefing.  Citations to the July 11, 2022 hearing transcript are abbreviated as "7/11/22 Tr. ___."  Citations to the April 30, 2021 video recording from Pennsylvania State Police are abbreviated as "4/30/21 Rec. __."  Hearing exhibits are cited as "Gov't Ex. __" and "Def. Ex. __."  This recitation of facts reflects the court's credibility determinations.  Specifically, we find the testimony of Trooper Konopka to be highly credible.

unit, over seven years of experience with PSP, and had received "significant training in the areas of interdiction, search and seizure, traffic stops," and "human behavior." (See id. at 4:15-6:2; see also Gov't Ex. 1 at 1-4).

Around 9:15 a.m., Trooper Konopka noticed a silver Toyota Sienna with an Illinois license plate pass by his parked PSP vehicle while traveling east on I-78 near Fogelsville. (See 7/11/22 Tr. 6:12-7:8; 4/30/21 Rec. 26:55-27:00). He testified that I-78 constitutes a "known drug trafficking corridor" because it serves as a "main artery running straight into New York City . . . a source and a consumption city for drugs and narcotics." (See 7/11/22 Tr. 18:9-19:5). According to Trooper Konopka, as the Sienna passed, he observed the driver exhibit what he considered to be an abnormal reaction to his presence: the driver had "a very rigid posture" and his arms "were fully locked out at the 10 and 2 position." (See id. at 7:12-8:20, 68:6-12). The vehicle stayed in the left or passing lane of traffic—without overtaking any other vehicles—as the driver repeatedly applied his brakes. (See id. at 8:23-9:13, 10:8-11). The vehicle's failure to pass anyone as it continued traveling in the left lane of traffic constituted a violation of Pennsylvania's Vehicle Code. (See id. at 10:12-21); see also 75 PA. CONS. STAT. § 3313(d). Trooper Konopka pulled out onto I-78 in the same direction as the Sienna, and over the course of a mile, he observed the car's brakes applied for so long that he "actually thought the brake lights might have been broken." (See 7/11/22 Tr. 9:18-20).

The vehicle soon moved to the right lane, and Trooper Konopka remained in the left lane "just off [the Sienna's] bumper." (See id. at 11:3-7). He then "clocked the vehicle's speed" by maintaining an even distance from the vehicle. (See id. at

11:6-11).  Trooper Konopka clocked the Sienna traveling 65 miles per hour.  (See id. at 11:3-5, 16:25-17:3).  He determined that the driver was speeding because the speed limit on that portion of I-78 is 55 miles per hour.  (See id. at 16:6-25); see also 75 PA. CONS. STAT. § 3362(a)(2).  Trooper Konopka proceeded alongside the Sienna and observed:  (1) several large boxes in the back of the vehicle, (2) the driver was the only person in the car, and (3) the driver did not acknowledge the trooper's presence as they drove side by side.  (See 7/11/22 Tr. 11:21-13:8).  Trooper Konopka also conducted a "NCIC"[2] inquiry using the car's Illinois license plate and learned the Sienna was a rental vehicle.  (See id. at 13:9-14).  He considered this fact "significant," based upon his training and experience.  Trooper Konopka testified that drug trafficking organizations often utilize rental cars because law enforcement typically will not seize them, they tend to be reliable vehicles, and they "blend in with the average motoring public."  (See id. at 13:15-14:21).

Trooper Konopka activated his lights and initiated a traffic stop.  (See id. at 19:9-11).  A mobile vehicle recorder ("MVR") on the dashboard of the PSP vehicle captured the encounter.  (See Gov't Ex. 5).  The video shows Trooper Konopka exit his vehicle and approach the Sienna on the passenger side.  (See 4/30/21 Rec. 1:21-1:32).  At the suppression hearing, Trooper Konopka explained that, as he approached the vehicle, several details stood out to him.  He confirmed the presence of several large rectangular boxes in the car—from a short distance, he

---

[2] NCIC is an acronym for the "National Crime Information Center," the FBI's central computerized database for criminal information.  See United States v. Fraguela-Casanova, 858 F. Supp. 2d 432, 437 (M.D. Pa. 2012) (Conner, J.).

noticed that they "appeared to be opened and resealed"—and observed that the vehicle's third-row sun screening shades were activated and partially obscuring his view into the car.  (See 7/11/22 Tr. 23:25-24:22, 75:7-76:3).  He also noticed the driver had three cell phones, two on the front passenger seat and one in the center console, which he testified is a common way for drug traffickers to "compartmentalize their person life from their illicit" activities.  (See id. at 24:23-25:12).  Finally, Trooper Konopka spotted two open energy drinks in the console—indicating a potentially lengthy trip—and a small black bag on the second-row seat. (See id. at 25:13-16, 76:1-3).

On the MVR, Trooper Konopka greets Latorre-Cacho and explains the left-lane violation to him.  (See 4/30/21 Rec. 1:21-1:32).  Latorre-Cacho answers in basic English, "I don't know, me no living here, me go to vacation with my house, my brother."  (See id. at 1:32-1:36).  Trooper Konopka then asks in Spanish where he is coming from, to which Latorre-Cacho responds in English that he lives in Buffalo, but stayed in a hotel the previous night about "two and a half hours from New York."  (See id. at 1:36-1:51).  When Trooper Konopka inquires about his travel destination, Latorre-Cacho responds that he is visiting his brother in New York City.  (See id. at 1:51-1:56).  Latorre-Cacho also confirms that he rented the Sienna from an Avis at the Buffalo airport "two days ago."  (See id. at 1:56-2:31).  In light of the location of the traffic stop vis-à-vis his purported home residence, Trooper Konopka again asks Latorre-Cacho where his trip originated.  Latorre-Cacho responds, "my friend lives in Pennsylvania."  (See id. at 2:31-2:37).  He then used his cell phone to display a map of Lebanon, Pennsylvania.  (See 7/11/22 Tr. 73:17-23).

Latorre-Cacho presented his New York driver's license, but he was unable to produce the car's rental contract. In lieu of the rental contract, he provided a receipt-sized document from Avis, filled out with his name and the car's make, model, and license plate number. (See id. at 28:22-29:15; see also Gov't Ex. 9). The document does not provide the pick-up or return location, nor does it indicate when the rental expires. (See Gov't Ex. 9). On video, after confirming the vehicle is a rental, Trooper Konopka informs Latorre-Cacho that he was driving too fast, noting he was "doing 10 over" and that the speed limit is 55 miles per hour on that portion of I-78. (See 4/30/21 Rec. 2:49-2:56). He then asks Latorre-Cacho to exit the Sienna and stand by the PSP vehicle while he checks the documentation. (See id. at 3:10-3:35). According to Trooper Konopka, his observations of and interactions with Latorre-Cacho revealed several peculiar and suspicious matters. (See 7/11 22 Tr. 29:16-22). In particular, he believed Latorre-Cacho's statements about his travel plans constituted "a rehearsed story," one commonly used by drug trafficking organizations. (See id. at 26:10-27:3). He found it strange that Latorre-Cacho was unable to say where he was coming from, but knew it was "two and a half hours" from New York City. (See id. at 27:3-19; see also Gov't Ex. 2 at 4).

The video shows Latorre-Cacho move to the PSP vehicle's passenger side window, and they continue speaking as Trooper Konopka inputs Latorre-Cacho's information. (See 4/30/21 Rec. 3:35-4:10). After confirming that Latorre-Cacho lives in Lockport, New York, and obtaining the last four digits of his social security number, Trooper Konopka engages in a wide-ranging conversation with Latorre-Cacho. (See id. at 4:10-6:45). Trooper Konopka asks Latorre-Cacho about his travel

plans to New York (to visit his brother), his employment (landscaping), and his reasons for driving a rental car (because his wife needed the one vehicle they share).  (See id.)  They also discuss the weather, the cost of living in New York City and Lockport, and even Latorre-Cacho's sleep apnea.  (See id.)  Eventually, Trooper Konopka's line of questioning shifts to the contents of the boxes in the back of the Sienna; Latorre-Cacho responds that they contain Bluetooth speakers from a Best Buy in Buffalo and that he purchased them for his brother.  (See id. at 6:45-7:58).  When Trooper Konopka asks why Latorre-Cacho would drive to Lebanon after buying speakers in Buffalo for a person in New York City, Latorre-Cacho indicates he received an address in Lebanon from someone else—"the GPS, me put in the address . . . they send it to me, this hotel"—and confirms that he stayed in a hotel the previous night.  (See id. at 7:58-8:45).  After Trooper Konopka inquires as to whether the vehicle contains narcotics, firearms, or large sums of cash, Latorre-Cacho assures him none of those items are present.  (See id. at 8:45-8:58).

Trooper Konopka testified that he took several actions on his computer while conversing with Latorre-Cacho.  (See 7/11/22 Tr. 29:24-30:19, 77:21-81:25).  This included running Latorre-Cacho's driver's license to ensure that it was not suspended, querying his name in a system that catalogs PSP reports, running a criminal history check, and starting to fill out a warning form.  (See id. at 30:13-19, 78:1-11, 81:19-25).  The criminal history check revealed that Latorre-Cacho had been arrested in Puerto Rico for "robbery, concealed weapons, and illegal appropriation of a vehicle."  (See Gov't Ex. 2 at 5; 7/11/22 Tr. 31:5-11).

Around the nine-minute mark, the video shows that Trooper Konopka asks for consent to search the vehicle, to which Latorre-Cacho responds, "Yeah." (See 4/30/21 Rec. 8:58-9:02). Trooper Konopka states that he has a consent form for Latorre-Cacho to sign and asks for his language preference. (See id. at 9:02-9:23). Latorre-Cacho opts for the Spanish version of the form, (see id.), which states, *inter alia*, that the individual consents to PSP searching the vehicle described and understands that he or she has the right to refuse the search request. (See Gov't Ex. 7). Trooper Konopka furnishes the Spanish-language consent form and asks Latorre-Cacho to read it, stating, "If you have any questions let me know. If you give me consent when you're done, you just need to print your name here, come down here and sign, print and put your address, okay?" (See 4/30/21 Rec. 10:37-10:48). Latorre-Cacho appears to read through the document for roughly 20 seconds, then asks, "Me no problem, but what happened, you stop me for . . . 10 mile up?" (See id. at 10:49-11:15). After Trooper Konopka reiterates the two traffic violations that precipitated the stop, Latorre-Cacho signs the consent form, then pauses before saying, "I'm so sorry." (See id. at 11:15-12:20; see also Gov't Ex. 6).

Trooper Konopka requests backup and proceeds to search the Sienna and its contents while intermittently asking Latorre-Cacho additional questions. (See 4/30/21 Rec. 13:15-1:01:01). At the suppression hearing, Trooper Konopka testified that he opened one of the boxes and made several initial observations: first, he detected "a very strong chemical smell" emanating from the box, which in fact contained a speaker. (See 7/11/22 Tr. 38:10-17). Second, he noticed the speaker had numerous hex-head screws that "were all tooled up." (See id. at 38:17-22). The

MVR shows Trooper Konopka remove one of the boxes from the trunk and inquire about their origin; Latorre-Cacho reiterates that he purchased them from Best Buy in Buffalo, but acknowledges that he does not have the receipts for them.  (See 4/30/21 Rec. 20:05-20:25).  Trooper Konopka observes that the boxes look as though they have been opened already, and Latorre-Cacho says he does not know why. (See id. at 20:40-20:48).  Trooper Konopka then asks, "I can open them though?" and Latorre-Cacho again confirms that he can.  (See id. at 20:50-20:55).  About a minute later, Latorre-Cacho states that the speakers he purchased were brand new. (See id. at 22:04-22:07).  Ten minutes into his inspection, Trooper Konopka asks whether Latorre-Cacho has an "Allen key" (or hex key) to access the speakers' inner contents.  (See id. at 33:30-33:36).  Latorre-Cacho initially holds his hands up and indicates he does not know, but then explains that he recently purchased an Allen key for a four-wheeler.  (See id. at 33:36-34:02).

About 40 minutes into the video, PSP Trooper Christopher Zampini arrives to assist Trooper Konopka with his inspection of the boxes' contents.  (See id. at 40:00-40:05).  Upon opening the second box, partially removing the speaker, and shining his flashlight into it, Trooper Konopka says that he "got something," and proceeds to handcuff Latorre-Cacho, informing him, "I am detaining you because you got something packaged up in there, and I don't know what it is, okay?"  (See id. at 43:42-44:10).

Upon continuing their inspection, Troopers Konopka and Zampini discover that the speakers contain numerous packages wrapped in black plastic.  (See id. at 44:10-1:10-06).  Trooper Konopka then reads Latorre-Cacho Miranda warnings in

English from a card.  (See id. at 1:10:07-1:10-35).  He concludes by asking, "Do you understand that you don't have to talk?"  (See id. at 1:10:35-1:10:38).  Latorre-Cacho's response is obscured by the noise of passing traffic.  (See id. at 1:10:38-41).  Trooper Konopka testified that Latorre-Cacho said "go ahead" and agreed to speak with him.  (See 7/11/22 Tr. 50:4-8, 94:24-95:9).  Latorre-Cacho then speaks further with Trooper Konopka about possibly setting up a controlled delivery to the location Latorre-Cacho was supposed to travel to in New York.  (See 4/30/21 Rec. 1:10:42-1:24:43; see also 7/11/22 Tr. 50:4-12).

While seated in the back of Trooper Konopka's vehicle, Latorre-Cacho also speaks over the phone in Spanish in a three-way call with his wife and Corporal Javier Garcia, who is a Spanish-speaking employee of PSP.  (See 4/30/21 Rec. 1:10:42-1:24:43; see also 7/11/22 Tr. 101:6-13, 102:11-23).  Corporal Garcia testified that Latorre-Cacho made admissions about the narcotics in the vehicle.  (See 7/11/22 Tr. 103:5-7).  After Latorre-Cacho was transported back to PSP barracks, he received Miranda warnings a second time.  (See id. at. 104:7-11).  Corporal Garcia provided these rights verbally in English, and handed Latorre-Cacho a card containing both English and Spanish iterations of the rights.  (See id. at 104:21-24; see also Gov't Ex. 17).  According to Corporal Garcia, Latorre-Cacho appeared to read the card, indicated that he understood his rights, and agreed to answer questions.  (See 7/11/22 Tr. 104:25-105:7).

Trooper Konopka acknowledged that he recognized English was not Latorre-Cacho's primary language; he posed his first question to Latorre-Cacho in Spanish.  (See id. at 91:9-15).  However, he testified that he was able to understand and

9

communicate with Latorre-Cacho, and it was his "full impression" that Latorre-Cacho also understood his statements and questions throughout their interaction. (See id. at 28:19-29:5, 31:16-18).  In his official report, Trooper Konopka notes that Latorre-Cacho seemed to have little trouble understanding most of his questions, and selectively employed "huh" as a "stall" tactic when asked about the contents of the boxes in the Sienna or the reason he possessed three cell phones.  (See Gov't Ex. 2 at 5, 8).

In June 2021, a federal grand jury returned a one-count indictment charging Latorre-Cacho with possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  Latorre-Cacho pled not guilty and now moves to suppress evidence from the search of the vehicle as well as statements he made following his arrest.  The motions are fully briefed and ripe for disposition.

## II.   Discussion

Latorre-Cacho concedes that Trooper Konopka had probable cause to believe that he had committed a traffic violation and therefore lawfully was permitted to initiate the traffic stop.  (See Doc. 63 at 6).  However, he claims that Trooper Konopka impermissibly prolonged the stop and that his consent to search the vehicle and subsequent Miranda waiver were involuntary.  We address each of these arguments seriatim.

### A.   Reasonableness of the Extended Stop

The Fourth Amendment to the United States Constitution ensures that people are "secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures." U.S. CONST. amend. IV.  When a police
officer has reasonable suspicion that a traffic violation has occurred, the officer may
stop the vehicle within the bounds of the Fourth Amendment.  See United States v.
Green, 897 F.3d 173, 178 (3d Cir. 2018) (citing Navarette v. California, 572 U.S. 393
(2014); United States v. Delfin-Colina, 464 F.3d 392, 396-97 (3d Cir. 2006)).
Reasonable suspicion for a traffic stop requires law enforcement to possess
"specific, articulable facts that an individual was violating a traffic law."  See Delfin-
Colina, 464 F.3d at 398.  Pretextual motivations are irrelevant so long as the officer
witnessed "*any* technical violation of a traffic code."  See United States v. Mosley,
454 F.3d 249, 252 (3d Cir. 2006) (emphasis added) (citations omitted); see also United
States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012) ("pretextual traffic stops supported
by reasonable suspicion do not run afoul of the Fourth Amendment").

We agree with Latorre-Cacho that Trooper Konopka had probable cause to
believe that he committed two traffic violations.  First, Trooper Konopka testified
that he observed Latorre-Cacho driving in the left lane of traffic for over a mile
without passing any vehicles.  (See 7/11/22 Tr. 8:23-9:13, 10:8-21).  Under
Pennsylvania law, drivers traveling on highways with "two or more lanes for traffic
moving in the same direction" must drive in the right-hand lane unless certain
delineated exceptions apply.  See PA. CONS. STAT. § 3313(d)(1).  Trooper Konopka
testified that none of these exceptions applied to Latorre-Cacho's vehicle on that
day.  (See 7/11/22 Tr. 17:12-25).  Furthermore, Trooper Konopka "clocked" the
vehicle's speed at 65 mile per hour.  (See id. at 11:3-7, 16:22-17:3).  In Pennsylvania,
the maximum speed limit on this portion of I-78 is 55 miles per hour.  See PA. CONS.

STAT. § 3362(a)(2); (see also 7/11/22 Tr. 17:22-24). Given this testimony, which we find highly credible, Trooper Konopka easily possessed probable cause to stop Latorre-Cacho for violating the Vehicle Code. See Green, 897 F.3d at 178; Delfin-Colina, 464 F.3d at 396-97. Trooper Konopka's assignment to the SHIELD interdiction unit and his possible other motivations for the stop have no bearing on this conclusion. See Mosley, 454 F.3d at 252; Lewis, 672 F.3d at 237.

That said, an otherwise permissible traffic stop may violate the Fourth Amendment if law enforcement unreasonably prolongs the stop. See Illinois v. Caballes, 543 U.S. 405, 407 (2005) (citing United States v. Jacobsen, 466 U.S. 109, 124 (1984)). The permissible length of a traffic stop is context specific. See Rodriguez v. United States, 75 U.S. 348, 354 (2015) (citations omitted). The court must consider the "mission" of the traffic stop, as well as any related safety concerns or activities incident to it, when evaluating whether law enforcement takes an unreasonable amount of time to complete the stop. See id. at 1614-15. Generally, an officer may visually inspect the vehicle's interior, Mosley, 454 F.3d at 252, "check[] the driver's license, determin[e] whether there are any outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance," Rodriguez, 575 U.S. at 355 (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). An officer may also ask "some questions relating to a driver's travel plans." See United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020) (citations omitted). Officers lose the authority to continue a stop when they "divert[] from a stop's traffic-based purpose to investigate other crimes" absent reasonable suspicion to do so. See United States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022) (quoting Green, 897 F.3d at 179).

The Court of Appeals for the Third Circuit employs a two-step analysis to determine whether a lawfully initiated stop is extended in violation of the Fourth Amendment.  See Green, 897 F.3d at 179.  First, we must pinpoint "when the stop was measurably extended"—*i.e.*, when the "Rodriguez moment" occurred.  See id. (internal quotations marks and citations omitted).  Second, we must determine whether law enforcement possessed reasonable suspicion to extend the stop at the Rodriguez moment.  See id.  Events that occur subsequent to the Rodriguez moment cannot inform our determination.  See Hurtt, 31 F.4th at 159 (citing Green, 897 F.3d at 182).  Additionally, "'unrelated inquiries' resulting in even a *de minimis* extension [of the traffic stop] are unlawful if not supported by reasonable suspicion."  See id. at 160 (citing Rodriguez, 575 U.S. at 375).  In sum, the purpose of this two-stage analysis is to determine "whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality."  See Hurtt, 31 F.4th at 159.  If law enforcement possessed reasonable suspicion of criminal activity at or before the Rodriguez moment, no Fourth Amendment violation has occurred.  See Garner, 961 F.3d at 271.

In the matter *sub judice*, the parties dispute when the Rodriguez moment occurred.  Latorre-Cacho maintains that it happened "approximately four minutes into the stop" after Trooper Konopka completed his "routine inquiry into Latorre-Cacho's driver's license."  (See Doc. 37 at 10; see also Doc. 63 at 9 (asserting that "Trooper Konopka went off-mission nearly immediately into the traffic stop")).  The government argues that Trooper Konopka possessed reasonable suspicion that criminal activity was afoot when he requested Latorre-Cacho's consent to search

the vehicle, roughly nine minutes into the stop.  (See Doc. 46 at 31; Doc. 66 at 32). The parties' disagreement centers on the propriety of Trooper Konopka's additional questions while Latorre-Cacho stood at the passenger window of the PSP vehicle, before he requested consent to search it.  Trooper Konopka ran Latorre-Cacho's driver's license information—indisputably part of the "mission" of the traffic stop— while *simultaneously* posing questions about Latorre-Cacho's travel plans, reasons for driving a rental car, and the contents of the boxes.  Cf. Hurtt, 31 F.4th at 159.

Acknowledging that "the Rodriguez rule is far easier to articulate than to apply" and "solicitous of [Latorre-Cacho's] Fourth Amendment rights," see Green, 897 F.2d at 179, we conclude that the Rodriguez moment occurred about seven minutes into the stop, when Trooper Konopka began asking Latorre-Cacho about the boxes in his vehicle.  (See 4/30/21 Rec. 6:43-6:47).  Until this point, Trooper Konopka's questions relate to verifying Latorre-Cacho's identity, travel plans, or rental details for the Sienna.  (See id. at 4:04-6:40).  They also converse on mundane topics like the weather, the cost of living in Lockport versus New York, and Latorre-Cacho's sleep apnea.  (See id.)  However, Trooper Konopka's inquiry about the boxes in Latorre-Cacho's vehicle have no bearing on the initiation or execution of the traffic stop.  Between Trooper Konopka's initial question related to the boxes, and his request for Latorre-Cacho's consent to search, he learns the boxes contain Bluetooth speakers from a Best Buy in Buffalo, and that they are for Latorre-Cacho's brother in the Bronx.  (See id. at 6:43-7:10).  He also questions why Latorre-Cacho would stop in Lebanon on the way to New York, and learns that an unknown

14

"they" sent Latorre-Cacho the address to a hotel in Pennsylvania.  (See id. at 7:10-8:45).[3]  We will not consider this information in our analysis.

Having determined the Rodriguez moment, we next consider whether Trooper Konopka possessed reasonable suspicion to prolong the stop at that precise moment.  Reasonable suspicion is "a particularized and objective basis" that the person stopped is engaged in criminal activity based on the "totality of the circumstances."  See United States v. Brown, 765 F.3d 278, 290 (3d Cir. 2014) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  That quantum of cause requires more than an inchoate "hunch" but "considerably less than a preponderance of the evidence."  See id. (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).  An objectively reasonable officer may draw on his or her own "experience and specialized training to make inferences from and deductions about

---

[3] At an unspecified interval, Trooper Konopka also runs a criminal history check, which shows that Latorre-Cacho previously was arrested in Puerto Rico. (See 4/30/21 Rec. 6:43-8:57; Gov't Ex. 2 at 5).  The parties dispute whether this check can be considered part of the traffic stop's mission.  (See Doc. 37 at 10, 10 n.3; Doc. 46 at 26-27).  Our court of appeals has not decided this issue in a precedential opinion after Rodriguez.  See United States v. Frierson, 611 F. App'x 82, 85 (3d Cir. 2015) (nonprecedential) (stating that "any preliminary delay in checking [defendant's] license, registration, and criminal history was justified as part of the stop"); see also United States v. Hunter, No. CR 19-635, 2021 WL 5356770, at *4 & n.6 (E.D. Pa. Nov. 17, 2021); cf. United States v. Clark, 902 F.3d 404, 411 (3d Cir. 2018) (holding that an officer's verbal questions about defendant's criminal history, after already conducting a criminal history check, was "not tied to the traffic stop's mission").  Here, neither the MVR footage nor the suppression hearing testimony indicates the precise time Trooper Konopka checked Latorre-Cacho's criminal history.  Moreover, although the Rodriguez Court reaffirmed the authority of an investigating officer to check if a detained driver has any open warrants, see Rodriguez, 575 U.S. at 355, it is unclear whether a more in-depth criminal history query is part and parcel of that search or wholly separate from it.  Due to the lack of precision in the record, and the dearth of precedential Third Circuit case law, we do not include Latorre-Cacho's prior arrest in our analysis.

the cumulative evidence available to them." See id. (quoting Arvizu, 534 U.S. at 273); United States v. Thompson, 772 F.3d 752, 758 (3d Cir. 2014).

We have little difficulty concluding that Trooper Konopka possessed reasonable suspicion to expand the stop beyond its initial traffic-enforcement mission. The factors contributing to Trooper Konopka's suspicion that were in his ken before he began asking questions about the boxes included: Latorre-Cacho's initial physical reaction and rigid, or "locked out," position upon passing Trooper Konopka's vehicle; the use of a rental vehicle, which Trooper Konopka knew from training and experience is a common method for transporting drugs; Latorre-Cacho's inability to produce a rental contract; the location of the stop on a known "drug corridor"; the presence of multiple large boxes of electronic equipment in the car that, in Trooper Konopka's initial observation as he approached the vehicle, appeared to have been "opened and re-taped"; the use of sun shades to partially obscure the backseat where the boxes were located; Latorre-Cacho's highly unusual route of travel between Buffalo and New York City, particularly his overnight stay at a hotel in Lebanon, where he claimed he was visiting a "friend"; Trooper Konopka's reasonable belief that Latorre-Cacho's travel plans were a "rehearsed story"; the presence of three cell phones in a car with only one occupant; and the presence of multiple open energy drinks in the console, which indicated that Latorre-Cacho had been driving longer than he initially suggested. Standing alone, each of these facts are capable of innocent explanation. However, taken together in the light of Trooper Konopka's training and experience with drug trafficking

investigations, they provided a sufficiently particularized basis on which to extend the stop for criminal investigative purposes.  See Brown, 765 F.3d at 290.

Based upon our analysis under Rodriguez and its progeny, we conclude that Trooper Konopka did not violate the Fourth Amendment when he "measurably extended" the stop.  Cf. Green, 897 F.3d at 179.  We will deny the motion to suppress on this basis.

### B.    Consent to Search

Warrantless searches "are *per se* unreasonable—subject only to a few specifically established and well-delineated exceptions."  United States v. Mallory, 765 F.3d 373, 382 (3d Cir. 2014) (citation omitted).  A search conducted with consent constitutes one such exception.  See Givan, 320 F.3d at 459.  Police may conduct a search with consent that is "freely and voluntarily given."  See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).  Consent is not voluntary, however, when provided under duress or as a result of coercion.  See id. at 227.  The government bears the burden of proving consent by a preponderance of the evidence.  See United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)).

Courts evaluate the voluntariness of consent through a totality-of-the-circumstances analysis.  Price, 558 F.3d at 278 (citing Schneckloth, 412 U.S. at 227).  Factors include information about the individual such as age, education, intelligence, and whether he has experience with the criminal justice system.  Id.  We consider whether the individual "was advised of his constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of

physical punishment." Id.  Courts also analyze "the setting in which the consent was obtained, [and] the parties' verbal and non-verbal actions." See Givan, 320 F.3d at 459 (citation omitted).  Law enforcement officers are not required to provide a consent form, nor must they inform the subject of his right to refuse consent. See Price, 558 F.3d at 279.  No single factor controls the voluntariness analysis, see Schneckloth, 412 U.S. at 226, and the extent of a subject's command of the English language is just one factor for consideration, see United States v. Kim, 27 F.3d 947, 954 (3d Cir. 1994); United States v. Velasquez, 885 F.2d 1076, 1082 (3d Cir. 1989); see also United States v. Ramirez-Mendoza, No. 4:20-CR-00107, 2021 WL 4502266, at *6 n.93 (M.D. Pa. Oct. 1, 2021) (Brann, C.J.) (noting the "gold standard" for any interaction with language barriers is a "foreign-language consent form").

In the instant matter, Trooper Konopka obtained Latorre-Cacho's consent to search three times.  First, after a brief inquiry, Trooper Konopka asked, "Can I search your vehicle?," to which Latorre-Cacho responded, "Yeah."  (See 4/30/21 Rec. 8:58-9:04).  Next, the trooper furnished a written consent form in Latorre-Cacho's preferred language, noted that he could ask questions about the form, and indicated where Latorre-Cacho should sign "*if*" he gives consent.  (See id. at 9:15-10:50).  After Latorre-Cacho signed the form, Trooper Konopka began searching the vehicle.  (See id. at 10:50-20:40).  Upon removing one box from the trunk, Trooper Konopka *again* requested—and unmistakably obtained—Latorre-Cacho's verbal consent to open and inspect its contents.  (See id. at 20:45-20:53).  In short, this was a non-coercive setting in which Latorre-Cacho received both verbal and written information about Trooper Konopka's request for consent to search. Cf. Givan, 320

F.3d at 459.  Trooper Konopka's request for consent arose within ten minutes of the stop's initiation, and the MVR indicates no duress or coercion—such as an unholstered weapon or threats of arrest—of any kind.  Cf. Schneckloth, 412 U.S. at 222, 227.

Latorre-Cacho's words and actions also demonstrate that he understood what he was doing when he consented to the searches.  The record indicates he was over 35 years old at the time of the traffic stop.  (See Gov't Ex. 2 at 34).  While the court has not received any information regarding his education level, our independent review of the MVR footage leads us to conclude he is of at least average intelligence and able to carry on a conversation in English with little difficulty.  Latorre-Cacho also appears to read over the Spanish-language consent form before asking Trooper Konopka to reiterate why he was stopped and, with that information in tow, ultimately signing the form.  (See 4/30/21 Rec. 10:49-11:15).

Given Trooper Konopka's credible testimony, as well as our careful review of the MVR footage, we conclude that Latorre-Cacho's consent to the search of the Sienna was "freely and voluntarily given" under the totality of the circumstances.  Cf. Schneckloth, 412 U.S. at 222, 227.  The slight language barrier that the parties encountered during this stop is outweighed by numerous other indicia of voluntariness.  See Kim, 27 F.3d at 954; Velasquez, 885 F.2d at 1082; Ramirez-Mendoza, 2021 WL 4502266, at *6 n.93.  Accordingly, we will deny the motion to suppress on this basis as well.

### C.    Miranda Warnings

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court of the United States held that before a criminal suspect is subjected to custodial police interrogation, he must be informed of certain rights.  These rights include the right to remain silent and the right to have counsel—either appointed or retained—present during questioning.  See Miranda, 384 U.S. at 444.  He must also be warned that any statements he makes may be used as evidence against him.  See id.  Failure to apprise the suspect of his Miranda rights may render any statements procured during interrogation inadmissible at trial.  See id.

Any waiver of Miranda rights must be "knowing, intelligent, and voluntary." Maryland v. Shatzer, 559 U.S. 98, 104 (2010) (citing Miranda, 384 U.S. at 475).  To be considered knowing and intelligent, a waiver must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  See United States v. Syriuth, 98 F.3d 739, 748-49 (3d Cir. 1996) (quoting United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989)).  A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  See id. (quoting Velasquez, 885 F.2d at 1084).

As with consent searches, we test the validity of a Miranda waiver by looking to the totality of the circumstances.  See United States v. Rought, 11 F.4th 178, 187 (3d Cir. 2021) (citing Velasquez, 885 F.2d at 1086).  In determining a Miranda waiver's validity, we consider the suspect's "background, experience, and conduct," see Velasquez, 885 F.2d at 1086 (citing Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983)), "including prior dealings with the criminal justice system," Rought, 11 F.4th

20

at 187 (quoting <u>Jacobs</u>, 431 F.3d at 108).  A suspect's language barrier may be a relevant factor in the validity analysis.  <u>See</u> <u>United States v. Caraballo</u>, 643 F. App'x 163, 169 (3d Cir. 2016) (nonprecedential) (citing <u>Syriuth</u>, 98 F.3d at 749).

A waiver need not be explicit to be effective.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 375-76 (1979).  Nor must a waiver be acknowledged or confirmed in writing.  <u>See</u> <u>United States v. Stuckey</u>, 441 F.2d 1104, 1105 (3d Cir. 1971).  A suspect may impliedly waive his right to remain silent by voluntarily speaking to officers after receiving <u>Miranda</u> warnings.  <u>See</u> <u>Berguis v. Thompkins</u>, 560 U.S. 370, 384-85 (2010) ("Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").  Whether explicit or implicit, the government bears the burden of establishing the validity of a <u>Miranda</u> waiver.  <u>See</u> <u>Connelly</u>, 479 U.S. at 168 (collecting cases).

In this matter, Latorre-Cacho validly waived his <u>Miranda</u> rights.  The MVR footage, which runs for more than 90 minutes, amply demonstrates that he had sufficient knowledge of spoken English to understand Trooper Konopka's <u>Miranda</u> warnings.  Indeed, he conversed with Trooper Konopka in English effectively throughout the encounter.  Trooper Konopka also ended his recitation of the <u>Miranda</u> warnings by reducing them to a plain-English question, asking, "Do you understand that you don't have to talk?"  (<u>See</u> 4/30/21 Rec. 1:10:35-1:10:38).  According to Trooper Konopka, Latorre-Cacho replied, "Go ahead," and they discussed the possibility of Latorre-Cacho cooperating with the investigation.  (<u>See</u> <u>id.</u> at 1:10:38-1:11:55; 7/11/22 Tr. 94:24-95:12).  The MVR footage demonstrates that

Trooper Konopka did not use force, intimidation, coercion, or deception when explaining the <u>Miranda</u> warnings to Latorre-Cacho.  <u>Cf.</u> <u>Syriuth</u>, 98 F.3d at 748-49. *Per contra*, after reading the warnings, Trooper Konopka confirms that Latorre-Cacho understands his right to refuse to speak before asking any questions.

Latorre-Cacho's responses to Trooper Konopka also indicate that he understood his rights and voluntarily agreed to waive them.  In earlier parts of their interaction, Latorre-Cacho asks for clarification or for Trooper Konopka to repeat a question.  But he expressed no confusion as his rights were recited to him, and he did not seek clarification or otherwise indicate a lack of understanding.  <u>Cf.</u> <u>Velasquez</u>, 885 F.2d at 1086.  Although Latorre-Cacho occasionally asks Trooper Konopka to repeat questions, our review of the MVR leads us to conclude that his comprehension problems were more a product of the loud noises caused by passing traffic than any language barrier.  (<u>See, e.g.</u>, 4/30/21 Rec. 4:40-5:25, 6:45-7:01, 7:54-8:25, 8:58-9:00).  We find that he knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights.  <u>Cf.</u> <u>Caraballo</u>, 643 F. App'x at 169.  Because Latorre-Cacho continued to speak with Trooper Konopka of his own volition after receiving <u>Miranda</u> warnings, he implicitly waived his right to remain silent.  <u>See</u> <u>Berguis</u>, 560 U.S. at 384-85.  We will therefore deny the motion to suppress on this basis.[4]

---

[4] Latorre-Cacho only contests the validity of the <u>Miranda</u> warnings as read by Trooper Konopka near the end of the traffic stop.  (<u>See</u> Doc. 34 ¶¶ 6-7).  Hence, the parties' initial briefs address only that waiver.  (<u>See</u> Docs. 35, 46).  Although the government also defends the additional <u>Miranda</u> warnings provided by Corporal Garcia after Latorre-Cacho arrived back at the barracks, (<u>see</u> Doc. 66 at 48-49), we need not consider them because Latorre-Cacho does not challenge their validity.

**III.**    **Conclusion**

We will deny Latorre-Cacho's motions (Docs. 34, 36) to suppress.  An

appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    October 28, 2022